UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
 :
CORPORACION FRUTICOLA DE
CHINCHA, SAC, ET AL.,  :

　　　　　　　　　　Plaintiffs,  :  **OPINION AND ORDER**

　　　　-against-  :  05 Civ. 6293 (KNF)

WATERMELON DEPOT, INC., ET AL.,  :

　　　　　　　　　　Defendants.  :
------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

　　　　Plaintiffs Corporacion Fruticola de Chincha, SAC ("CFC") and J & C Enterprises, Inc. ("JC"), brought this action pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a-499s, as amended, against Watermelon Depot, Inc. ("WDI"), Kil Ho Lee, Ju Gil Joen, a/k/a John Joen ("Joen"), Dae Won Produce Distributor, Inc., d/b/a Yonkers Produce, Serk Hon Lee ("Lee"), Dae Won Lee and Group Joa Corp. ("GJC"), to recover damages for: (1) conversion; (2) breach of the PACA obligation to account and make prompt payments; (3) breach of an oral consignment contract; (4) breach of the PACA trust obligation; and (5) an accounting. JC also sought injunctive relief compelling the surrender and disgorgement of PACA trust assets. On November 7, 2005, the assigned district judge granted a motion for judgment by default to: (i) JC "in the liquidated amount of $24,095.50 plus costs and disbursements of this action in the amount of $150.00, amounting in all to $24,245.50;" and (ii) CFC "in the liquidated amount of $213,559.76 plus costs and disbursements of this action in

1

the amount of $150.00, amounting in all to $213,709.76." On February 7, 2007, the assigned district judge granted Joen's motion to vacate the default judgment entered against him, pursuant to Fed. R. Civ. P. 60(b)(1), after determining that: (a) Joen's default was not willful; (b) Joen may have a meritorious defense to the extent that he can establish he was not an officer of Watermelon Depot, Inc.; and (c) the plaintiffs will not be prejudiced substantially if the default against Joen is vacated. Pursuant to 28 U.S.C. § 636(c), the parties consented to having a non-jury trial of this action, presided over by a United States magistrate judge. In the joint pre-trial order, CFC indicated it would pursue, at trial, its conversion claim against Joen, seeking $213,559.76 in damages and JC indicated it would pursue, at trial, a claim for breach of a PACA trust obligation against Joen, seeking $24,095.50 in damages and injunctive relief compelling the surrender and disgorgement of PACA trust assets.

That trial was held on March 19, 2008. The following are the Court's findings of fact and conclusions of law, made pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

CFC is a Peruvian corporation which exports grapes, avocados and citrus to the United States and other countries and Gonzalo Bedoya ("Bedoya") is its general manager. In January 2005, Joen and Roberto Soto ("Soto"), a JC representative, visited Bedoya's office in Peru. Joen told Bedoya he represented WDI and was interested in taking grapes from Bedoya on consignment.[1] During that visit, Bedoya contends Joen referred to WDI as "my business," repeatedly. At that time, Bedoya and Joen were negotiating the terms of the consignment, but

---

[1] A consignment is a transfer of goods to a merchant for sale with the understanding that the seller will pay the owner for the goods from the proceeds. See BLACK'S LAW DICTIONARY 327 (8th ed. 20004).

Bedoya needed more information about WDI before agreeing to consign his grapes to it. Joen never mentioned that he needed to contact anyone else to approve the terms of the agreement or that he had partners. At the end of the meeting in Peru, Joen invited Bedoya to visit WDI in New York, to see "my warehouse" and "my customers." Bedoya testified that giving his grapes on consignment to a United States seller required, on his part, a high degree of trust in the seller. Subsequent to their meeting in Peru and according to the industry practice, Joen provided Bedoya information about WDI from the "blue book," a directory of companies and persons in the produce business. The "blue book" listed Joen as the only individual associated with WDI.

Thereafter, Bedoya and Joen entered into an agreement providing that CFC would ship the grapes from Peru to WDI, on a consignment basis, such that WDI would: (a) sell the grapes for the market price; (b) deduct a commission of ten percent from the sale proceeds as well as the reasonable and necessary sale expenses, specifically freight; and (c) return promptly, to CFC, the net proceeds from the sale. Joen communicated with Bedoya via e-mail messages, signing his e-mail messages with "watermelon depot John Joen" and "John Joen." Joen also communicated to Bedoya, via an e-mail message, that he received the consigned grapes. In an e-mail message to Bedoya, dated February 1, 2005, Joen promised to send the money owed to Bedoya's bank. Bedoya testified that the payments were personally guaranteed by Joen many times during their telephone conversations, and during a visit Bedoya made to WDI's facilities, in New York.

In March 2005, Bedoya visited Joen in New York, at Joen's invitation, to see "his premises" and the arrival of the containers. During that visit, Joen showed Bedoya WDI's offices and warehouse, took him to the Hunts Point Market and to lunch. Bedoya testified that Joen drove Bedoya around personally and was always "in charge of his business." Joen also took

Bedoya to dinner, with approximately fifteen other WDI employees, and paid for all the meals as well as Bedoya's hotel room. Bedoya and Joen communicated in English and Joen never indicated he was not proficient in communicating via e-mail or that he was using someone else to communicate electronically on his behalf. According to Bedoya, during his telephone conversations with Joen, Joen indicated "he was the one sending his emails, saying I'll put an email to you now." When Bedoya visited Joen in New York, he observed Joen handle cash, a "big bundle of money," approximately $6,000 to $8,000, which he used "to pay people." Joen also received cash and, Bedoya observed while in Joen's office, kept a lot of cash in his pocket.

By April 6, 2005, WDI sold all the grapes CFC consigned to it. Joen told Bedoya, during an April 6, 2005 telephone conversation, that he had a few problems collecting the money for the grapes sold, and agreed to transfer $250,000 to CFC by April 15. In an e-mail communication to Joen, dated April 6, 2005, Bedoya memorialized their telephone conversation of that date: "to confirm what we spoke over the phone. By April 15th you will transfer US$250,000.00 to us and final account by the end of April. Please reconfirm." According to Bedoya, on April 21, 2005, he and Joen had another telephone conversation during which Bedoya noted Joen had failed to fulfill his payment commitment, and Joen asked for more time. During the first week of May, 2005, Bedoya made numerous telephone calls to WDI, asking to speak with Joen or someone in accounting, but the receptionist informed him, each time, that he had to speak with Joen, who was not available. After these unsuccessful attempts to reach Joen by telephone, Bedoya sent Joen an e-mail message, on May 6, 2005, stating in pertinent part:

> I am trying to call you to know if you have already made the transfer you promised. Please answer my email confirming the transfer of US$50,000 starting today for week 18, another US$50,000 week 19, another US$50,000 week 20, another US$50,000 week 21

4

and final transfer when you come to Peru beginning of June. Final accounting balance US$213,559.76 (FOB) including the US$1.50 per box of Expenses that you have discounted. (we will discuss this when you come to Peru)

Bedoya testified he received an e-mail message from Joen, dated May 26, in which Joen detailed how and when he would make payments to CFC. According to Bedoya, the final account balance due to CFC by WID is $213,559.76. He testified that he arrived at that amount based on the amounts stated in "the liquidation" documents sent to him by Joen. The liquidation documents introduced into evidence at the trial demonstrate the following amounts were owed by WDI: (a) $13,378.99, document dated March 1, 2005; (b) $13,378.99, document dated March 10, 2005, (c) $26,900.93, document dated March 14, 2005; and (d) $10,783.62, document dated March 29, 2005. Bedoya testified that, although they never agreed on it, Joen discounted "$1.50 per box of expenses." Notwithstanding the fact that the total amount of the liquidation documents introduced into evidence at trial is $64,442.53, Bedoya testified, WDI owes $213,559.76 to CFC, based on the United States Agriculture Market reports for the market value of the grapes during the period when they were shipped.

Joen testified that, in 2000, he met Lee at a produce company where they both worked. After a few years, Lee started his own business, WDI, in Hunts Point Market, and offered Joen employment as a sales manager in his new company, which Joen accepted. Joen testified that he was employed by WID as a sales manager from November 2004 to May 2005, and worked under Lee's direction. Joen stated he: (a) did not own stocks in WDI; (b) was not WDI's officer; (c) had no authority over corporate funds; (d) had no signature authority for banking transactions; and (e) did not participate in managerial decisions with respect to corporate finances. Joen testified it was his understanding that Lee was WDI's sole shareholder. According to Joen, he

5

never had control over any PACA trust funds and never participated in any activity with the intent to convert the plaintiffs' funds or to defeat the defendants' PACA trust rights. Joen recalled that he met Bedoya during his sales trip to Peru. He stated that his business card did not identify him as WDI's owner or officer. Joen testified that he spoke to Bedoya in a mixture of the Spanish and English languages and, although he "referred to things with the word 'my,'" he was not using that word "in an ownership sense." Joen testified he would sometime sell produce for cash but he denied handling cash on behalf of WDI or that he possessed cash in his hands. Joen also testified WDI had financial problems before closing, in May 2005, and he was not paid for the last three months he worked there. Joen stated he does not know how to use e-mail to communicate and that all his e-mail communications were composed by WDI's secretary and sent by the secretary only upon Lee's order. Joen recalled directing that an e-mail message be sent to Bedoya, acknowledging approximately $162,313.59 was owed to CFC, for around ten or eleven containers of grapes, and proposing a payment plan for that amount. Joen stated that no money was paid to CFC by WDI for the grapes consigned. However, Joen denied that he had any authority to make payments but stated that he urged Lee to make the payments to CFC.

Joen also testified that, while he was employed by WDI, Lee concocted a plan to form GJC in order to raise capital necessary to pay WDI's creditors. According to Joen, he intended to contribute $125,000 to GJC and it was planned that he be its president. However, Joen testified, he refused to sign the proposed GJC shareholder agreement because it was "highly favorable" to Lee, and he never contributed any capital to GJC. Joen testified he never intended to transfer WDI assets to GJC.

6

## CONCLUSIONS OF LAW

*CFC's Conversion Claim*

"Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Employers' Fire Ins. Co. v. Cotten, 245 N.Y.102, 105 (1927). To establish the tort of conversion, a plaintiff must demonstrate, by a preponderance of the evidence: (1) "plaintiff's possessory right or interest in the property;" and (2) 'defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito v. N.Y. Organ Donor Network, Inc. , 8 N.Y.3d 43, 50, 827 N.Y.S.2d 96, 100 (2006). "Where the property is money, it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." Republic of Haiti v. Duvalier, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 ( App. Div. 1st Dep't 1995); see Fiorenti v. Cent. Emergency Physicians, PLLC, 305 A.D.2d 453, 455, 762 N.Y.S.2d 402, 403-04 (App. Div. 2nd Dep't 2003); Key Bank of N.Y. v. Grossi, 227 A.D.2d 841, 843, 642 N.Y.S.2d 403, 405 (App. Div. 3rd Dep't 1996); Citipostal, Inc. v. Unistar Leasing, 283 A.D.2d 916, 919, 724 N.Y.S.2d 555, 559 (App. Div. 4th Dep't 2001). A plaintiff's right of possession may be infringed by a wrongful: (i) taking; (ii) detention; or (iii) disposal. See Pierpoint v. Hoyt, 260 N.Y. 26, 29 (1932). Some affirmative act by a defendant must be demonstrated to satisfy the unlawful dominion or interference with the plaintiff's property, such as: "asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant." State v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 260, 746 N.Y.S.2d

637, 646 (2002). A wrongful intent is not an element of conversion. See Brown v. Garey, 267 N.Y. 167, 170 (1935).

Moreover, an action for conversion cannot be predicated on a breach of contract. See Fesseha v. TD Waterhouse Investor Services, 305 A.D.2d 268, 269, 761 N.Y.S.2d 22, 24 (App. Div. 1st Dep't 2003). "A conversion claim cannot be based only on the allegation that a defendant received money and failed to remit payment to the plaintiff." Interstate Adjusters, Inc. v. First Fidelity Bank, N.A., N.J., 251 A.D.2d 232, 234, 675 N.Y.S.2d 42, 44 (App. Div. 1st Dep't 1998). While conversion may not be predicated on a breach of contract, a breach of contract may be accompanied by a tort, but "only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated." Luxonomy Cars, Inc. v. Citibank, N.A., 65 A.D.2d 549, 550, 408 N.Y.S.2d 951, 954 (App. Div. 2d Dep't 1978).

The evidence adduced at trial demonstrates unequivocally that CFC: (a) specifically identified money as the proceeds from the sale of its grapes consigned to WDI; and (b) has an interest in the proceeds from the sale of the grapes it consigned to WDI. Therefore, CFC established the first element of its conversion claim. However, the gravamen of CFC's conversion claim is contractual and CFC failed to present evidence, independent of WDI's failure to fulfill its contractual obligation, that would be sufficient to give rise to liability for conversion. It is undisputed that CFC consigned grapes to WDI, based on the agreement, the terms of which were negotiated by Bedoya and Joen. According to that agreement: (1) CFC would ship the grapes from Peru to WDI, on a consignment basis; (2) WDI would sell grapes for the market price; (3) WDI would deduct its commission from the sale proceeds as well as the

reasonable and necessary expenses of sale; and (4) WDI would remit net proceeds from the sale to CFC promptly. The evidence adduced at trial shows that WDI sold the grapes consigned to it, but did not remit the proceeds of the sale to CFC. The evidence also demonstrates that Bedoya demanded payment of the money owed to CFC and Joen promised to transfer money to CFC, at least on two occasions: on February 1, 2005, and in an e-mail message, acknowledging that WDI owed CFC approximately $162,313.59, and proposing a payment plan.

Joen's failure to pay the money owed to CFC, without proof of any wrongful act to show Joen's dominion over the proceeds of the sale or interference with it, in derogation of plaintiff's rights, is not sufficient to satisfy the second element of the instant conversion claim. No evidence was presented that Joen detained or disposed of the money owed to CFC for his own devices, or that he asserted a claim on the money owed to CFC or otherwise commercially exploited the money owed to CFC. Joen's intention to form a corporation and contribute $125,000 to it, as a shareholder, cannot constitute a tortious act required for conversion. Where a defendant had a contractual obligation to pay money to a plaintiff, promised to fulfill that contractual obligation, but failed to do so, and no evidence, independent of the failure to fulfill the contractual obligation, is presented to demonstrate the defendant's wrongful interference with the plaintiff's money, a claim of conversion cannot be sustained. Therefore, the Court finds that Joen is not liable to CFC for conversion.

*JC's Breach of PACA Trust Obligation Claim*

To establish a breach of trust under PACA, the plaintiff must demonstrate, by a preponderance of the evidence, "a violation by the trustee of any duty which as trustee he owes to the beneficiary." Armata v. Korea Commercial Bank of N.Y., 367 F.3d 123, 129 (2d Cir.

2004)(citation omitted). Regulations promulgated under PACA provide that PACA trustees are "required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities. Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [7 U.S.C. § 499b]." 7 C.F.R. § 46.46(d)(1).

JC did not present any evidence at trial, in connection with the breach of PACA trust obligation claim it made against Joen. Accordingly, the Court finds that Joen is not liable to JC on that claim.

Dated: New York, New York
July 31, 2008

SO ORDERED:

*Kevin Nathaniel Fox*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

10